UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

STEPHEN ZERVAN,

             Plaintiff,                     Case No. 02-10319-BC
                                              Honorable David M.  Lawson

v.

MADAY CONSTRUCTION, INCORPORATED
EMPLOYEES PROFIT-SHARING PLAN,
MADAY CONSTRUCTION, INCORPORATED,
EDWARD W. MADAY, PATRICK F. MADAY,
and LINDA J. SCHARICH,

             Defendants.

_____/

**OPINION AND ORDER GRANTING IN PART PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT AND DISMISSING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT AS UNTIMELY**

The plaintiff, Stephen Zervan, formerly employed by the defendant, Maday Construction, Inc., has filed this action under sections 204, 502, and 510 of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1054, 1132, and 1140, alleging that he was deprived of benefits to which he was entitled under a profit sharing plan established by the company and administered by the other defendants, some of whom were plan trustees.  The plaintiff contends that the plan trustees breached various fiduciary and statutory duties, which resulted in financial loss to him.  The plaintiff filed a motion for summary judgment.  The defendants filed an untimely motion for summary judgment, which the Court will consider as a response to the plaintiff's motion.  A hearing on the motion was held on April 1, 2004 and the Court took the matter under advisement.  After due consideration, the Court now finds that the amendment to the pension plan, which changed the way a departing employee's share of the plan assets would be valued, was invalid.  The plaintiff should have received a distribution after he quit his job with the company valued as of the last day of the

preceding year.  The defendants also violated certain notification requirements under ERISA.  Fact questions preclude summary judgment on the plaintiff's other claims.  Therefore, the Court will grant the plaintiff's motion for summary judgment in part and deny it in part.  The defendants' motion for summary judgment will be dismissed as untimely.

<div align="center">I.</div>

The plaintiff's main complaint in this case is that when he voluntarily left the defendant's employ, he was not given all that he believed he was entitled under a profit sharing plan maintained by the defendant company.  The plaintiff attributes this shortfall to mismanagement by the plan trustees; an amendment to the plan, which the plaintiff contends is illegal; and an in-kind distribution of plan assets to the company founder and patriarch, which drastically imbalanced the remaining plan assets toward risky securities and undermined the strategy of responsible diversification of investments.

Although the parties disagree over some critical details, the main facts are not in dispute.  According to the affidavits and documents submitted by the parties, Stephen Zervan was employed for over twenty years as a mason for defendant Maday Construction, Inc.  The company was founded by Edward Maday in the early 1970s.  During that time, Maday also created and participated in an  Employee Profit Sharing Plan (plan), which, the parties agree, was part of an "employee pension benefit plan" governed by ERISA.  *See* 29 U.S.C. § 1002(2)(A).  The company also maintained a pension plan, but that was consolidated with the profit sharing plan in the mid 1990s.  The plaintiff, who was employed by Maday from 1977 until 2001, was fully vested in the profit sharing plan.

Edward Maday retired and sold the business to his four children in 1996, and they all began participating in the plan. By 1997, Linda Scharich and Patrick Maday, two of the children, became the plan's trustees. Instead of accepting an immediate distribution of his account upon retirement, Edward Maday continued to participate in the plan after his retirement. At the time of the events surrounding this litigation the shareholders of Maday Construction consisted of the following Maday family members:

> Linda Scharich, President and Treasurer, 25.3%
> Joseph Maday, Vice President and Secretary, 24.9%
> Patrick Maday, Vice President, 24.9%
> Gary Maday, Vice President, 24.9%

Neither of the parties has furnished a copy of the plan itself to the Court. However, the summary plan description (SPD) is part of the record. Although the plan summary warns, "Although this SPD describes the Plan, THE LEGAL PLAN and TRUST DOCUMENTS CONTROL," Compl., Ex A ¶ 1.1, neither party has alleged that there is a discrepancy. The Court, therefore, will assume that the plan summary accurately describes the contents of the plan itself.

The plan is a self-described, defined contribution, profit sharing plan under which "retirement benefits . . . are based on the amount in the Participant's account at retirement." *Id.* ¶ 1.3. The plan is funded by "'substantial and recurring,' though generally discretionary contributions." *Id.* ¶ 1.2. It appears that employees who actually retire from the company receive a monthly amount in the form of an annuity that is purchased with the money in their individual account at retirement age; those employees who do not reach retirement age while working for the company receive benefits "in some other form." *Ibid.* Another section states that a participant is allowed a choice of how to receive his benefit, such as an annuity, lump-sum, or payments over a given number of years. *Id.* ¶ 2.10. The plan is managed by an "Administrator," who is one or more

persons appointed by the company. *Id.* ¶ 1.7. The administrator interprets the plan and "also decide[s] the form in which a Participant receives Plan benefits." *Ibid.*

Although the stated duration of the plan is indefinite, the company retains "the right to amend or terminate the Plan at any time." *Id.* ¶ 1.11. The plan summary states however, "In general no Plan amendment can be made that would deprive you of the money or property already legally earned or accrued by you." *Ibid.* The plan administrator assumes the duty of notifying participants of decisions that affect their rights: "Sometimes the Administrator will make a decision or interpretation which affects all Participants. If so, the Administrator will notify all Participants. When the Administrator makes a decision affecting only the benefit of a single Participant, that decision is given to that Participant." *Id.* ¶ 2.17. A plan participant may appeal adverse decisions through the mechanism set forth in that section.

Zervan testified that he received summaries of contributions to the profit sharing plan until the 1998 annual statement, but none thereafter until April 1, 2001, at which time he received the report for 1999 and 2000. On June 11, 1998, the plan trustees gave plan participants a written memorandum explaining their decision to switch financial advisers and invest aggressively in stocks with more growth potential. The memorandum stated:

> This is a note to update you on the Maday Construction, Inc. Profit Sharing Plan and its past and current performance. In 1996 we consolidated the Pension Plan and the Profit Sharing Plan. At that time we chose a Financial Advisor/Money Manager who had been recommended to us due to his past track record and ability to make money in a down market. Unfortunately, what we found is that he was excellent in a down market but in an up market he failed to capitalize. In 1996 his performance [was] okay, but not as good as we had hoped. This concerned us and we carefully watched him as we moved into 1997 and began researching other management companies. His main concern was that the stock market would crash and because of this, he had us in stocks that would thrive in a down market, but we were taking a beating in the up market. We voiced our concern for his management style and he strongly felt he was right even though we were losing money at the time. At that point, we fired him

-4-

and hired Smith Barney, who is able to put us with 2 management firms able to protect our investments as well as make them grow. Smith Barney began overseeing the management of our money at the end of July and has done quite well. Unfortunately, since we were so far down they could not bring us back up to where we wanted by the end of the year.  Therefore, you may have noticed a loss for the plan year 1997.

. . .

We are constantly monitoring how the Plan is doing and are striving to get the highest return without taking a high risk.  The money is balanced out between the stock market, money markets, and short-term government bonds.  If there seems to be any threat of uncertainty in the market they move us into a higher cash position to minimize our risk.  Thus far, we seem to being doing quite well, but will continue to monitor the returns closely.  I will keep you posted as the year goes on.  If you have any questions, please feel free to contact me.  Linda

Pl.'s Mot. Summ. J. Ex. 103, Memorandum (June 11, 1998).  By December 31, 1998, the plaintiff's interest in the plan totaled $115,880.20.  Pl. Aff. at ¶ 11.  He had accrued within the plan a "total vested account balance" of $120,899.10.  Compl.¶ 13; Answer ¶ 13.

Company founder Edward Maday's interest in the plan equaled one-half of its total value by the year 2000, according to Linda J. Scharich, one of the trustees.  Pl's Mot. for Summ. J. Scharich Dep. at 17.  Edward Maday turned 70-½ years old in June of 2000 and received his share of plan assets.  However, instead of liquidating the securities in the plan's investment portfolio to pay Edward Maday's benefits, the plan administrators made an in-kind contribution of the securities, many of which were United States treasury notes.  Scharich described the distribution and her rationale for choosing the securities that were given to her father as follows:

> Q.     Would it be accurate to say that you recollect that the bulk of the U.S. Treasury notes were distributed to your father?
>
> A.     I know they – I mean I know that obviously it made sense to give him the more conservative – I really don't know if it was the bulk of it or not. I am gray on that area.

-5-

> Q.    You made a comment that it made more sense to give him the more conservative, and I think you were going to say assets or securities, is that correct?
>
> A.    Correct.  Not all of them obviously.  But –
>
> Q.    And why do you say that?  Why did it make more sense to give him those?
>
> A.    Well, basically he was 70 and a half and the remaining participant's average age was 37 so the growth funds seems to make more sense in a younger profit sharing plan than in a retiree's.  And I'm not saying that was the whole determination. But I know there was some question as far as, you know, why was this one given over that one.

*Id.* at 28.  An appendix to the affidavit of Patrick Tiernan, Jr., a stock broker who serviced the company's plan account, contains the plan's account statement describing the account before and after Maday's distribution.  The assets can be summarized as follows:

Account Valuation Summary

|  | At 06/30/00 |  | At 05/27/00 |
|---|---|---|---|
| Account Balances | 0.00 |  | 15.79 credit |
| Money Market Balance | 9,038.54 | 1.0% | 56,573.42 |
| Equities and Options | 534,391.53 | 61.1% | 1,252,111.46 |
| Mutual Funds & Unit Trusts | 331,612.67 | 37.9% | 345,598.98 |
| Fixed Income Securities | 0.0 |  | 221,340.83 |
| Other Investments | 0.0 |  | 0.0 |
| Total Portfolio | 875,042.74 | 100.0% | 1,875,640.48 |

Patrick Tiernan, Jr. Aff. Ex. A, Plan Account Summary at 1.  The plaintiff's counsel sent a letter to the defendant's counsel summarizing results of an investigation into the distribution Edward Maday received.  That letter was attached to the plaintiff's summary judgment motion brief and sets forth the plaintiff's position of the account status.  Although the defendants question the propriety of plaintiff's counsel attaching his own letter to the motion papers since he cannot be a witness in the

case, the defendants do not dispute the facts he asserts concerning the asset distribution.  They do

take issue with his conclusions and inferences, however.  The letter states:

> Thank you for forwarding the supplemental information regarding the Maday
> Construction pension.  While I haven't yet reviewed all of the materials, I was able
> to review the activities that took place in June, 2000 . . .
>
> Regarding the June, 2000 activities, it is very clear that the primary beneficiary and
> (former ?) owner of the company, Mr. Maday, received preferential consideration
> when exiting the pension.  It appears that great effort was made to purchase and sell
> securities and then divide those securities in a manner most favorable to the primary
> beneficiary.  Consider, for example the fact that Mr. Maday received all of the U.S.
> Treasury notes.  Also as part of the transfer of assets to the primary beneficiary, the
> following stocks were distributed to him in whole, leaving no shares for the other
> pension participants:

| COMPANY | SHARES |
|---|---|
| Bank of America | 450 |
| Briston Meyers Squibb | 800 |
| Coastal | 115 |
| Johnson & Johnson | 500 |
| KLA - Tenor | 80 |
| Philip Morris | 600 |
| Sanmina | 140 |

> The primary beneficiary apparently elected not to take any shares of the following
> securities:

| COMPANY | SHARES |
|---|---|
| ADC Telecom | 190 |
| Converse Technology | 100 |
| Columbia/HCA Healthcare | 550 |
| Connextant | 400 |
| Hewlett Packard | 190 |
| Paychex | 157 |
| Praxair | 200 |
| Scientific Atlanta | 110 |
| Symbol Technologies | 180 |
| First Trust Unit 389 | 10,052 |

-7-

There was also disproportional distribution when shares of stock were divided, apparently at the election of the primary beneficiary:

| COMPANY | SHARES RETAINED BY PENSION/ TOTAL SHARES |
|---|---|
| American Internal Group | 50/ 150 |
| America Online | 360/ 600 |
| General Electric | 280/ 780 |
| Intel | 150/ 400 |
| Microsoft | 250/ 650 |
| Morgan Stanley | 100/ 280 |
| Worldcom | 294/ 694 |

As of the time the transaction were undertaken, the primary beneficiary secured the lower risk Treasury notes, blue chip stocks and the financially stronger technologies, while the pension plan was left with a disproportional weighting of shares in more troubled companies and/or those having less financial strength.

Pl.'s Mot. Summ. J. Ex. 119, Letter from Pl. to Def. (Apr. 2, 2002) at 1-3. The plaintiff acknowledges that the summary is not a complete listing of the plan's holdings or Maday's distribution.

By December 31, 2001, unbeknownst to the plaintiff, his interest in the plan assets fell to $88,572.41, following a downward trend in the overall financial markets. Zervan Aff. at ¶ 11. In March 2001, the plaintiff heard from a co-worker that the plan suffered significant losses. On March 14, 2001, Joseph Maday informed the plaintiff in response to an inquiry that all participants lost the same percentage of money. Upset, Zervan quit his employment and immediately walked off the job. Todd Scharich, Edward Maday's son-in-law, while at a seminar in Florida contacted the plaintiff on the company's behalf later that day stating that plan information was not available until he returned to Michigan and assured the plaintiff that plan participants received equal treatment. Pl.'s Mot. Summ. J. at 4-5. Another employee for the defendant, Patrick Tierman, also contacted the

plaintiff and answered questions.  On March 16, 2001, Linda Scharich conversed with the plaintiff

to explain that the profit-sharing plan was not like a 401(k)-type plan and offered to answer any

questions the plaintiff would pose in writing.  The plaintiff agreed to prepare a list of his questions.

He said that his continued employment with the defendant would be contingent on his satisfaction

with the answers he received.  *Id*. at 5.

Zervan returned to work and submitted the following written questions to the plan trustees

on March 22, 2001:

    1.  Exactly where is my money (how much is it costing)?
    2.  Is everyone [sic] money in the same account?
    3.  Why can't money be withdrawn at termination?
    4.  Why didn't we get our statement from 1999?
    5.  Why do I find out from someone else that nearly 1/3 of my retirement is gone?
    6.  Why weren't we told that our money was being shifted from one place to another?
    7.  Why haven't we got our statement from 2000?
    8.  Why weren't we included in the decision to move money around?
    9.  Why is Nells saying his account (2000) is nearly the same as (1998)?
    10.  Why is Gig[']s account down 30%?
    11.  Why does Todd get mad at me for trying to find out what's going on?  Bonus porportionaly [sic] down 2000?  Feel underpaid[.] 5 years worth of compensation wiped out!
    12.  (After calling Pat) Why doesn't he tell me what kind of plan we have?  Example: he said he didn't know if you had to leave it in for a year or not!  How could he not know that?  What I had to do to make [a] living.  Was told two years ago that it was beneficial for co. if we didn't work Saturdays, so I didn't as a result my bonus and profit sharing, hrs worked were all down.  Had to take on side work.  Now this is bening [sic] told have to be available to work Saturdays (even though it not beneficial for company).  What if Co. doesn't do well?  No compensation (bonus) not available for side work?  No living going backwards[.]

Pl.'s Mot. Summ. J. Ex. 106. Pl.'s Questions (Mar. 22, 2001).

On March 28, 2001, Scharich sent her response, which addressed only nine of the plaintiff's

questions.  Scharich's letter stated:

    I will try to respond to each of the nine questions which you provided me on March 22nd:

1. All of the profit sharing plan money for all participants has been placed with First Union Securities. At the time we placed the money with that firm, we were led to believe that they would be able to achieve investments results, which exceed the average market returns. The management fees paid to that company amount to approximately 1.00% to 1.25% per year.

2. If a plan participant terminates employment, then the plan participant is entitled to receive his or her plan account. That can be done by either a direct distribution to the participant (which would require the payment of income taxes) or the account can be rolled over to an IRA Plan and/or pensions of a successor employer.

3. I thought all participants received a valuation statement for the year 1999, which was intended to be the case. As you know, I was very ill during 1999 and it is possible that I did not give the 1999 valuation statements to all participants. That certainly was not intentional.

4. We have not yet received the final year 2000 individual valuations from the plan administrator. As you are undoubtedly aware, the stock market had very poor results last year, and our plan was not an exception. It does appear that we lost about 30% last year, which applies to all of our accounts. None of us will be satisfied or happy with the results achieved by our money manager.

5. No participants are specifically informed as to where or how the plan assets have been invested. We did change money managers in 1999, with a view to improving investment results. Unfortunately, that did not occur.

6. See answer 3 above.

7. The plan provides that the trustees are to invest the assets of the plan. None of us are experts in investments, so the trustees decided to retain a money manager to exercise the investment decisions. We conferred with both our plan administrator and plan attorneys and tried to make the best decision for all of us.

8. Our plan was designed so all of the plan assets are invested on behalf of the plan. If you an[d]/or other participants had requested to individually invest you[r] share of the plan, then we probably would have modified the plan to permit that to occur. In view of what has happened this past year, we have indeed recently talked to our attorneys and plan administrator and will probably be implementing changes to the plan which will indeed give each participant the right to invest their own portion if they want to so do.

9. All of us received a bonus, which was comparable to the prior year. In your particular situation, you worked about 10% less hours and you received a bonus that was about 10% lower than the prior year. We have always felt very highly about your capabilities and we appreciate your loyalty and years of service . . . .

Pl.'s Mot. Summ. J. Ex. 107, Letter to Steven Zervan from Linda Scharich (Mar. 28, 2001). The plaintiff was not satisfied with this response and tendered his resignation on April 2, 2001.

-10-

Meanwhile, on March 29, 2001, the plan trustees amended the plan without notice to the plaintiff. The original plan, drafted during a rising market, valued the interest of a participant who left the company's employment before retirement as of December 31 of the year preceding employment termination. Under the original plan provision and based on account balances, the plaintiff would be entitled to a distribution in the amount of $88,572.41 if he left his job in 2001. The amended plan provision, however, called for an assessment of the departing employee's interest as of the thirtieth day of the month in which the employee terminates employment. Under the amended plan, the plaintiff alleges he was entitled to an interest of only $77,275 upon his departure in April 2000. *See* Pl.'s Mot. Summ J. Ex. 114, Letter to Linda Scharich from Stephen Zervan (July 12, 2001). The plan summary does not include the critical language concerning how the value of a participant's interest will be calculated if he leaves employment prior to retirement, but the parties do not dispute the interpretation of the plan before or after amendment.

The plaintiff requested distribution of his plan benefits on April 20, 2001, about three weeks after he resigned. It was not until the beginning of July 2001 that he learned that his interest in the plan assets had decreased to due to the declining market and the plan's new method of valuing his interest. Pl. Aff. at ¶ 12-13. The plaintiff then communicated his disagreement with the valuation of his plan benefits and again requested distribution of his interest:

> Also, I wish to have all of my profit sharing benefits distributed to me but I don't feel I can complete the necessary forms at this time. I don't agree with the information that has been provided me and I haven't received specific information regarding how my account declined from approximately $120,000.00 at the end of 1999 to less than $78,000.00 today.
>
> As you know, I gave the company at least two weeks notice of my termination. At that time, my vested balance amounted to $88,572.41. The company withheld information from me and others regarding the profit-sharing plan for a long period of time. I never received my 1999 profit-sharing statement during 2000 and the

-11-

company has never explained to me how it lost more than $30,000.00, despite my having made inquiries as to the health of the plan and/or my account.  That contributed to my decision to leave the company.  Only later was I informed that the company changed its policy so that it now claims it owes me less than $78,000.00 to me as my share of the profit-sharing plan.

Please confirm that I'm at least entitled to the vested balance as of December 31, 2000 so that I may complete any documents that are required for distribution.

Pl.'s Mot. Summ. J. Ex. 114, Pl.'s Letter to Linda Scharich (July 12, 2001).  Counsel for the

defendants responded by letter on July 25, 2001:

This letter comes in response to your letter of July 12th directed to Mrs. Linda Scharich wherein you asked for confirmation that you are entitled to your vested balance as of December 31, 2000.

Our records reflect that you terminated your employment with Maday on April 2, 2001.  Under the provisions of a recent plan amendment dated March 29, 2001 (copy enclosed), the account of a terminated employee will be "valued as the last day of the month in which the participant makes the request for distribution".  Thus, in your case, your account will be valued as of April 30, 2001 and not valued as of the last day of the Plan Year (December 31, 2000).

Pl.'s Mot. Summ. J. Ex. 115, Letter to Stephan Zervan from Attorney John Wolf (July 25, 2001).

The plaintiff challenged this distribution amount and would not accept less than the amount

he claimed.  As a result of the plaintiff's stance, the defendant never authorized the disbursement

of the plaintiff's interest from the plan.  Meanwhile, the plan's value continued to fall.  On June 12,

2002, the defendant notified the plaintiff of the plan's termination.  The plaintiff alleges that the

defendant first notified him in September 2002 that it had maintained his distribution interest as part

of the plan's investment account and his interest in the plan now totaled only $59,267.28.

The plaintiff subsequently filed a four-count complaint against the defendants alleging the

defendants: (1) violated pension plan provisions, under 29 U.S.C. § 1132; (2) breached fiduciary

duties, under 29 U.S.C. § 1104(a); (3) deprived him of accrued benefits, 29 U.S.C. § 1054; and (4)

-12-

retaliated against him and interfered with his attainment of accrued benefits, under 29 U.S.C. § 1140.

Count I alleges the defendants violated terms of the plan by: (a) failing to provide annual statements;

(b) misleading the plaintiff about intentions to amend the plan after the plaintiff announced his intent

to resign; (c) failing to warn the plaintiff of a change in the plan; (d) failing to amend the plan in

conformance with the procedural requirements of the plan provisions; (e) failing to offer to deliver

in full the plaintiff's vested account interest; (f) failing to secure and segregate the plaintiff's accrued

benefits after the plaintiff challenged his entitlement.  Twelve grounds form the basis for count II,

which alleges the defendants breached their fiduciary duties by: failing to provide the plaintiff with

an annual statement; failing to notify of high risk investments; investing in high-risk investments;

failing to diversify; engaging multiple brokers, which disrupted the plan's investment strategy;

failing to notify participants of losses; injuring other participants by distributing assets to Edward

Maday; preferentially distributing assets to Edward Maday; amending the terms of the plan to reduce

the plaintiff's vested interest; failing to give advance notice of the amendment; retaliating and

interfering with the plaintiff's rights by amending the plan; and providing preferential treatment to

Edward Maday because of his age.  The plaintiff seeks a declaratory judgment that he is entitled to

his account balance as of December 31, 1999, a preliminary injunction enjoining discontinuance of

the plan until such time as all benefits have been restored to the plaintiff, restitution to the plaintiff

of profits obtained by Edward Maday, funding of the plan to provide the plaintiff with his vested

benefits, and attorney fees and costs.  The Court issued an Amended Case Management and

Scheduling Order dated August 18, 2003 setting the deadline for filing dispositive motions on

November 24, 2003.  The plaintiff filed a motion for summary judgment on that date.  The

-13-

defendants filed a cross-motion for summary judgment on December 15, 2003, which was out of time.

II.

The decision to pay benefits, amend or terminate the plan, and value accounts are administrative decisions subject to judicial review. A plan participant may file a civil action in federal court "to recover benefits due to him under the terms of his [ERISA-qualified] plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). The Court reviews the plan administrator's decisions *de novo* unless the plan "gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan," in which case the Court "review[s] a decision to deny benefits under an 'arbitrary and capricious' standard of review." *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 291-92 (6th Cir. 2005) (quoting *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 168 (6th Cir. 2003)).

In this case, the plan language gives the administrator discretion to construe the plan and determine eligibility for benefits. However, there is no discretion to determine whether to provide annual statements, effectuate amendments in the manner required by the statute, or discharge the duties of a fiduciary. *See* 29 U.S.C. § 1104(a). Moreover, as a fiduciary, the plan administrators had a duty to "act in the interest of the plan's beneficiaries." *Best v. Cyrus*, 310 F.3d 932, 935 (6th Cir. 2002). The administrators' obligations extended beyond the mandates of ERISA; "[f]iduciary duties under ERISA 'draw much of their content from the common law of trusts.'" *Ibid.* (quoting *Varity Corp. v. Howe*, 516 U.S. 489, 496 (1996)). "There is more to plan (or trust) administration than simply complying with the specific duties imposed by the plan documents or statutory regime;

-14-

it also includes the activities that are 'ordinary and natural means' of achieving the 'objective' of the plan." *Howe*, 526 U.S. at 504.

Finally, when applying the arbitrary and capricious standard of review, the Court "must take into consideration the fact that [the trustee] is acting under a potential conflict of interest because it is both the decision-maker, determining which claims are covered, and also the payor of those claims." *Calvert*, 409 F.3d at 292; *see also University Hosps. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846 (6th Cir. 2000).

The plaintiff's claims fall into three categories: (1) violation of plan provisions; (2) breach of fiduciary duties; and (3) retaliation. The Court will review these claims in light of the standards discussed above.

### A.

Section 502 of ERISA allows a plan beneficiary to file a civil action "to enforce his rights under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). The plaintiff contends that his rights were violated in several respects, including the denial of information about the plan's performance; the unfavorable plan amendment that reduced his account value as a departing employee and the manner in which that amendment was adopted; the refusal of the defendants to deliver in full the plaintiff's vested account interest; and their failure to secure and segregate the plaintiff's accrued benefits after the plaintiff challenged his account valuation.

### 1.

The plaintiff alleges that he was denied his right to be kept informed of the plan's status and the deteriorating performance of the plan's financial investments. Specifically, he alleges that the defendants violated their duties by not furnishing him with annual statements for 1999 and 2000.

-15-

The Court finds that the plaintiff has stated a valid claim with respect to the 1999 statement but not the 2000 statement.

Section 103 of ERISA requires pension benefit plan administrators to prepare annual reports describing the financial condition of the plan. 29 U.S.C. §1023(b)(2)-(3). That report must be distributed to each plan participant "[w]ithin 210 days after the close of the fiscal year of the plan." 29 U.S.C. § 1024(b)(3). The plan year in this case is the calendar year, so the statements must be furnished to the participants no later than the end of July of the following year.

The defendants admit that they did not furnish a financial report of the plan for 1999 until March of 2001. Answer ¶ 14. Therefore, there is no dispute that they violated their statutory duty. The plaintiff is entitled to summary judgment on his claim that he did not receive a statement of the plan's conditions as required by law. That statement, presumably, would have disclosed the status of his account in the plan, but it would not have revealed the distribution to Edward Maday, since that did not occur until June 2000.

The plaintiff also alleges that he did not receive his statement for the year 2000 on a timely basis. The plaintiff submitted his resignation on April 2, 2001, and as a former employee he was still due a timely account statement, even if the value of his account under the plan was in dispute. The plaintiff alleges that he did not receive the information included in an annual account statement until late March 2002. Pl.'s Mot. Summ. J. at 9. However, he stated in his affidavit that "the memorandum of June 11, 1998 . . . was the last communication I received from the management of Maday Construction [concerning the benefit plan], except perhaps for the annual report for 1998, until the spring of 2001." Pl. Aff. ¶ 6. The defendant provided no information as to when the plan statement for 2000 was provided to the plaintiff. It was not due by law until the end of July 2001,

and therefore it appears that the plaintiff's rights were not violated with respect to the statement for year 2000.

2.

The plaintiff also contends that the March 29, 2002 plan amendment was improper. The parties agree that under the original plan, if the plaintiff terminated his employment with the company before he reached retirement age his interest in the profit sharing plan would be valued as of December 31 of the preceding year. They also agree that the effect of the amendment was to change the valuation date to the thirtieth day of the month in which the plaintiff quit. It is also undisputed that because of the deterioration of the plan's investments, the plaintiff's retirement account value as of December 31, 2000 was $88,572.41, and by April 30, 2001 it had dropped to $77,275.00.

The plan itself states:

The Company intends to continue the Plan indefinitely, but does have the right to amend or terminate the Plan at any time. In general no Plan amendment can be made that would deprive you of the money or property already legally earned or accrued by you.

Compl., Ex A ¶ 1.11. Of course, that provision is subject to the governing sections of ERISA, which may restrict the ability of the plan administrators to enact certain amendments. For instance, section 204 of ERISA states that "[t]he accrued benefit of a participant under a plan may not be decreased by an amendment of the plan," subject to certain exceptions not pertinent here. 29 U.S.C. § 1054(g)(1). Another paragraph in that section states:

(1) An applicable pension plan may not be amended so as to provide for a significant reduction in the rate of future benefit accrual unless the plan administrator provides the notice described in paragraph (2) to each applicable individual (and to each employee organization representing applicable individuals).

-17-

(2) The notice required by paragraph (1) shall be written in a manner calculated to be understood by the average plan participant and shall provide sufficient information (as determined in accordance with regulations prescribed by the Secretary of the treasury) to allow applicable individuals to understand the effect of the plan amendment. . . .

(3) Except as provided in regulations prescribed by the Secretary of the Treasury, the notice required by paragraph (1) shall be provided within a reasonable time before the effective date of the plan amendment.

29 U.S.C. § 1054(h).

The plaintiff argues that the amendment deprived him of an earned or accrued benefit by changing the plan's valuation method. The plaintiff's interest in the plan, he argues, is an accrued benefit. However, these statutes do not affect the plan amendment in this case, at least insofar as it impacts the plaintiff. The amendment did not reduce the accrual benefit in the plaintiff's account, nor did it reduce the rate of future benefits. Rather, the impact of the amendment on the plaintiff resulted from the manner in which his account was valued as of the date to which he became entitled to a distribution. The amendment did not deprive the plaintiff of an accrued benefit. An "accrued benefit," after all, is merely "the balance of an individual's account" in an individual account plan such as this. 29 U.S.C. § 1002(23)(B). After the amendment, the plaintiff was still entitled to his share of the plan's assets through his individual account. The reduction in actual value resulted from the poor performance of the plan's investments; all plan members suffered in proportion.

The plaintiff's entitlement to a fixed sum did not occur until he actually quit, which was in April 2001. It was not until then that his individual account would be finally valued under the terms of the plan.

The defendants argue that the plaintiff was not entitled to a valuation even as of April 30, 2001 under the amendment because the plaintiff did not request a distribution of his share of the plan assets. That argument is at odds with the plain language of the plan, which states:

-18-

It is possible that you will not be or remain a full-time employee of the Company nor a Participant in this Plan up until your Normal Retirement Date. If this situation occurs, you will not receive a full pension, but you may still be entitled to some lesser pension benefits. What you would be entitled to is the pension you would have earned, or accrued based on Company contribution allocations in your Account *at the point your employment was terminated*.

Compl. Ex. A, Plan summary § 2.7 (emphasis added). Therefore, it is the termination date that controls.

The plan administrators have the discretion to amend the plan, and that amendment must be honored unless the decision is arbitrary or capricious (or a breach of fiduciary duty, discussed below). The Court believes, based on the undisputed facts, that the amendment was arbitrary. It is clear that the amendment disadvantaged those employees who left the company in a falling securities market, and it served to favor the employees who remained. The plan administrators, Linda Scharich and Patrick Maday, were also participants who directly benefitted from the amendment. They knew that the plaintiff was upset with the way the plan had been managed. He initially quit on March 14, 2001 but agreed to return to work contingent upon having his questions answered satisfactorily. The plan was amended without notice to the plaintiff two weeks later, when the defendants were well aware of the possible – if not likely – departure of the plaintiff, with the result that the plaintiff would be entitled to less money and the remaining employees, including the plan administrators, would be able to keep more. The defendants' conduct in amending the plan thereby was infused with a conflict of interest, which when considered in light of the timing of the amendment and its obvious adverse effect on the plaintiff and beneficial effect on the administrator's personal financial interest in the plan's assets amounted to an abuse of discretion. *See Davis v. Kentucky Finance Cos. Retirement Plan*, 887 F.2d 689, 694 (6th Cr. 1989) (stating "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that

conflict must be weighed as a 'factor[] in determining whether there is an abuse of discretion'")
(quoting Restatement (Second) of Trusts § 187, Comment d (1959)).

The amendment, therefore, cannot apply to the plaintiff.  He is entitled to a distribution of
his account balance valued according to the terms of the plan as they existed before the amendment.
The plaintiff terminated his employment in April 2001, so his individual account should have been
valued as of December 31, 2000.  He is entitled to a distribution of the value at that time, which the
parties agree was $88,572.41.  That amount should have been delivered to him when he left the
company's employment.

<div align="center">B.</div>

The plaintiff's arguments that the defendants breached fiduciary duties owed to him fall into
four categories: (1) the investment decisions made by the plan administrators; (2) the failure to
provide notice of poor performance; (3) the nature of the distribution made to Edward Maday; and
(4) the failure to notify the plaintiff of the intention to amend the plan.  The Supreme Court has held
that "the principal statutory duties imposed on the trustees relate to the proper management,
administration, and investment of fund assets, the maintenance of proper records, the disclosure of
specified information, and the avoidance of conflicts of interest." *Massachusetts Mutual Life Ins.
Co. v. Russell*, 473 U.S. 134, 142-43 (1985).  The statute provides the following general fiduciary
duties:

> (a) Prudent man standard of care
> (1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall
> discharge his duties with respect to a plan solely in the interest of the participants and
> beneficiaries and--
>
> (A) for the exclusive purpose of:
> (i) providing benefits to participants and their beneficiaries; and
> (ii) defraying reasonable expenses of administering the plan;

<div align="center">-20-</div>

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.

29 U.S.C. § 1104(a).

1.

The plaintiff criticizes the plan administrator's decisions to invest in high-risk investments and failing to diversify. The plan's portfolio became skewed toward higher-risk investments after the in-kind distribution to Edward Maday in June 2000. One would think that when it is time to make a distribution, the plan administrators would liquidate the plan's investments in such a way as to maximize returns while maintaining the mix of investments needed to continue the portfolio's diversity, and then make the distribution in cash. However, ERISA does not require that practice. Rather, as noted above, the plan trustees have a duty to protect the plan's assets "by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." 29 U.S.C. § 1104(a)(1)(c).

In *Metzler v. Graham*, 112 F.3d 207, 209 (5th Cir. 1997), the Fifth Circuit observed that no statute or regulation sets forth a formula for diversifying a plan's portfolio. However, the court provided this guidance:

The degree of investment concentration that would violate this requirement to diversify cannot be stated as a fixed percentage, because a fiduciary must consider the facts and circumstances of each case. The factors to be considered include (1) the purposes of the plan; (2) the amount of the plan assets; (3) financial and industrial conditions; (4) the type of investment, whether mortgages, bonds or shares of stock

-21-

or otherwise; (5) distribution as to geographical location; (6) distribution as to industries; (7) the dates of maturity. . . . Without minimizing the importance of the usual need for diversification of a plan's portfolio, however, the foregoing open-ended "facts and circumstances" list ought to caution judicial review of investment decisions. It is clearly imprudent to evaluate diversification solely in hindsight – plan fiduciaries can make honest mistakes that do not detract from a conclusion that their decisions were prudent at the time the investment was made.

To establish a violation, a plaintiff must demonstrate that the portfolio is not diversified "on its face." Once the plaintiff has established a failure to diversify, the burden shifts to the defendant to show that it was "clearly prudent" not to diversify. Prudence is evaluated at the time of the investment without the benefit of hindsight.

*Metzler v. Graham*, 112 F.3d 207, 209 (5th Cir. 1997) (citations omitted) (citing H.R. Rep. No.

1280, 93d Cong., 2d Sess. (1974), reprinted in 1974 U.S. Code Cong. & Admin. News 5038,

5084-85 (Conference report at 304)); *see also In Re Unisys Savings Plan Litigation*, 74 F.3d 420,

438 (3d Cir. 1996).

Another court has offered the following standard:

Under the duty of diversification, the trustee should not normally invest all or an unduly large portion of plan funds in a single security, or in any one type of security, or even in various types of securities that depend on the success of one enterprise. *See Marshall v. Teamsters Local 282 Pension Trust Fund*, 458 F. Supp. 986, 990 (E.D.N.Y. 1978).

*Bruner v. Boatmen's Trust Co.*, 918 F. Supp. 1347, 1353 (E.D. Mo. 1996).

The plaintiff is not entitled to summary judgment on this issue because the evidence he

provided does not establish that the investments remaining in the account after Edward Maday's

distribution were insufficiently diversified. He has presented no evidence of the risk associated with

the equity securities remaining in the account after Edward Maday received his distribution. The

plaintiff presented no reliable evidence of the assets in the plan account, their "financial and

industrial conditions," or any information about how the investments were expected to perform. The

plaintiff only presents an incomplete summary of the assets presented in a letter from the plaintiff's

-22-

attorney and urges the Court to accept that they are high risk without providing any other information about the equity. Even this summary, however, shows that the plan's investments were not concentrated in a single security or industry. The plaintiff attempts to bolster his argument by contending that the drop in the value of the plan after the distribution is indicative of the high risk of the remaining investments. But evidence of a loss of value does not indicate the stock's potential to perform prior to the drop. Similarly, evidence of the investments distributed from the portfolio does not show the risk of the investments that remain.

Because a question exists as to the nature and quality of the investments remaining in the portfolio after the in-kind distribution to Edward Maday, the plaintiff is not entitled to summary judgment on the diversification issue.

The plaintiff also argues that the defendants improperly engaged multiple brokers, which disrupted the plan's investment strategy. The "prudent person" requirement of 29 U.S.C. § 1104(a) could be violated by engaging multiple brokers if that practice resulted in churning and an undiversified investment portfolio. The alleged breach must be considered in light of the investment decisions of the fiduciaries and diversification of the portfolio. However, neither party developed argument or evidence on this ground of the claim that persuades the Court to grant summary judgment to either of them.

### 2.

The plaintiff next alleges the defendants breached their fiduciary duty to inform the plaintiff of the high-risk investments undertaken by the plan, the plan's losses, and the distribution to Edward Maday. As noted earlier, ERISA requires plan administrators to furnish annual statements for employee benefit plans that include:

-23-

(A) a statement of the assets and liabilities of the plan aggregated by categories and valued at their current value, and the same data displayed in comparative form for the end of the previous fiscal year of the plan;

(B) a statement of receipts and disbursements during the preceding twelve-month period aggregated by general sources and applications;

(C) a schedule of all assets held for investment purposes aggregated and identified by issuer, borrower, or lessor, or similar party to the transaction (including a notation as to whether such party is known to be a party in interest), maturity date, rate of interest, collateral, par or maturity value, cost, and current value;

29 U.S.C. § 1023(b)(3). To the extent that the defendants failed to comply with the disclosure requirements of the statute as the Court has already determined, they are liable for failing to disclose the investments and losses of the plan, and the distribution.

The plaintiff's claim goes further and alleges that the defendants should have disclosed the investment risk before the next annual statement was due. However, in *Sprague v. General Motors Corp.*, 133 F.3d 388 (6th Cir. 1998), the court held that "the 'comprehensive' disclosure provisions [of ERISA] control the broad fiduciary duty standard." *Id*. at 405. The court held:

It would be strange indeed if ERISA's fiduciary standards could be used to imply a duty to disclose information that ERISA's detailed disclosure provisions do not require to be disclosed. . . . As a matter of statutory construction, a specific statutory provision governs a general one – and here the "comprehensive" disclosure provisions control the broad fiduciary duty standard. . . . We are not aware of any court of appeals decision imposing fiduciary liability for a failure to disclose information that is not required to be disclosed.

*Id.* at 405-06. Under Sixth Circuit precedent, therefore, courts will not impose new duties upon the fiduciaries to disclose losses, risk in the plan, or a large distribution from the plan when there is no statutory requirement to make such disclosures. The plaintiff has pointed to no such obligation in the text of ERISA or the regulations. Therefore, summary judgment in the plaintiff's favor on this issue is not warranted.

-24-

3.

The plaintiff next argues that the defendants breached their fiduciary duty when they agreed to distribute the "safer" investments to Edward Maday as part of his lump-sum distribution in June 2000. He insists that the distribution gave preferential treatment to and unduly benefitted Edward Maday to the detriment of other plan participants. The standard of performance expected of the defendants is measured by the "prudent person" rule. Fiduciaries must make reasonable investments, *see* 29 CFR § 2550.404a-1, and they have a duty to protect the entire plan against misuse of assets. *See Russell*, 473 U.S. at 142 (observing that "[a] fair contextual reading of the statute makes it abundantly clear that its draftsmen were primarily concerned with the possible misuse of plan assets, and with remedies that would protect the entire plan, rather than with the rights of an individual beneficiary").

The distribution of assets to Edward Maday consisted of two investment decisions: which assets (if any) to distribute, and what to do with the investments that remained. There is a question of fact whether Edward Maday unfairly received too many of the portfolio's low risk investments, specifically most of the portfolio's treasury bonds. A prudent fiduciary may not have permitted the distributions as alleged, but the plaintiff has not established that proposition as a matter of law. Likewise, a fact question remains as to the propriety of retaining the remaining investments without rebalancing the portfolio, as noted above. The plaintiff is not entitled to summary judgment because he has not demonstrated that the investments that remained in the fund after the distribution were not sufficiently diversified.

For the same reason, fact questions remain on the plaintiff's claim that Edward Maday received preferential treatment because of his age. That claim can succeed only if the plaintiff can

-25-

prove that the in-kind distribution to Edward Maday was somehow advantageous to him and detrimental to the other plan participants based on the value and soundness of the investments as of the date of distribution.

<div align="center">4.</div>

The plaintiff asserts that the failure to notify him of the intended amendment to the plan amounts to a breach of fiduciary duty by the defendants.  The Court already has held that the defendant's amendment of the plan provisions concerning valuation of the interests of pre-retirement departing employees was an abuse of discretion with respect to the plaintiff.  Another reason the amendment is invalid centers on the duty of the defendants to disclose its intentions under the circumstances.  Although generally plan administrators need not provide notice unless specifically required by statute or regulation, *see Sprague*, 133 F.3d at 406, the Sixth Circuit has held that there are circumstances when a plan administrator has a duty to disclose action it contemplates when that action may have a significant impact on a participant's rights.  *McAuley v. International Business Machines Corp., Inc.*, 165 F.3d 1038, 1043 (6th Cir. 1999).  In that case, several former employees of the defendant accepted an early retirement proposal and ended their employment at year's end, only to find out later that the company offered a plan amendment effective one month after their last day worked that would have substantially increased their benefits.  The district court granted summary judgment to the company, but the court of appeals reversed, holding:

> Although an ERISA fiduciary is generally not required to disclose changes in a benefit plan before it is adopted, if an employer gives "serious consideration" to a change in plans, the employer has a fiduciary duty not to make either intentional or negligent misrepresentations to potential plan participants.  This duty to avoid material misrepresentations does not require the employer to predict an ultimate decision to offer a plan so long as it fairly discloses the progress of its serious considerations to make a plan available to affected employees.  A fiduciary has a duty not only to inform a beneficiary of new and relevant information as it arises, but

<div align="center">-26-</div>

also to advise him of circumstances that threaten interests relevant to the relationship.

*Id.* at 1043 (citations and internal quotes omitted). That duty extends to the obligation to speak up under circumstances where silence might mislead the beneficiary. *James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 451-52 (6th Cir. 2002) (noting that "the duty to inform is a constant thread in the relationship between beneficiary and trustee; it entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful") (quoting *Krohn v. Huron Memorial Hosp.*, 173 F.3d 542, 548-50 (6th Cir. 1999)); *see also Berlin v. Michigan Bell Telephone Co.*, 858 F.2d 1154, 1163 (6th Cir. 1988) (holding that "a fiduciary may not materially mislead those to whom the duties of loyalty and prudence described in 29 U.S.C. § 1104 are owed").

This case presents the mirror image of the facts of *McAuley*. Where as in that case, the plaintiffs were induced by silence to quit their jobs before a plan amendment that might benefit them took effect, in this case the plaintiff was encouraged to remain with the company while the plan was amended to his detriment. The failure to advise the plaintiff that the intended amendment was seriously contemplated amounts to a breach of fiduciary duty here as well when the change in the way the departing employee's interest in plan assets would be valued was changed by the amendment to his detriment. Based on the undisputed facts, the Court will grant the plaintiff's motion for summary judgment on the theory of breach of fiduciary duty concerning the amendment to the plan.

C.

The plaintiff is not entitled to summary judgment on his claim for retaliation.  To establish interference or retaliation with the attainment of ERISA rights under this section, a plaintiff must show: (1) prohibited employer conduct; (2) taken for the purpose of interference or retaliation; (3) with the attainment of any right to which the employee may become entitled.  *Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1043 (6th Cir. 1992) (interference with rights); *Mattei v. Mattei*, 126 F.3d 794, 804 (6th Cir. 1997) (retaliation for exercising rights).  Interference claims relate to the attainment of future rights and usually center on allegations that an employer terminated an employee in order to prevent "unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights."  *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1113 (6th Cir. 2001) (quoting *West v. Butler*, 621 F.2d 240, 245 (6th Cir.1980)).  No such claim is framed by the pleadings.

III.

The Court finds that the defendants violated the notification requirements of ERISA by failing to furnish timely the statements for the 1999 plan year.  The damages that flow from that violation remain to be determined.  The Court also finds that the plaintiff was entitled to a distribution of his plan account valued as of December 31, 2000.  Fact questions preclude summary judgment for the plaintiff on his other theories.  The defendants' motion for summary judgment is untimely.

Accordingly, it is **ORDERED** that the plaintiff's motion for summary judgment [dkt # 17] is **GRANTED IN PART AND DENIED IN PART**.

-28-

It is further **ORDERED** that the defendants' motion for summary judgment [dkt # 22] is **DISMISSED** as untimely.

It is further **ORDERED** that the attorneys for the parties shall appear for a status conference on **November 28, 2005 at 9:00 a.m.** to discuss a schedule for resolution of the claims that remain.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: October 31, 2005

<div style="border:1px solid;">

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on October 31, 2005.

s/Tracy A. Jacobs
TRACY A. JACOBS

</div>